THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OUR TOWN, a Sole Proprietorship | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | 3:16-CV-2484 |
| | : | (JUDGE MARIANI) |
| MICHAEL ROUSSEAU and | : | |
| JENNIFER ROUSSEAU | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Presently before the Court is a Motion for Temporary Restraining Order, (Doc. 2), filed by Plaintiff Our Town.  For the reasons that follow, Plaintiff's motion will be granted in part and denied in part.

## I.    INTRODUCTION AND PROCEDURAL HISTORY

On December 16, 2016, Plaintiff filed a Complaint against Defendants Michael and Jennifer Rousseau asserting three counts:  (1) breach of contract; (2) tortious interference with contractual and/or prospective business relations; and (3) "misappropriation of confidential information, trade secrets, and vendor relationships/inevitable disclosure."[1] (Doc. 1).  That same day, Plaintiff filed a Motion for Temporary Restraining Order.  (Doc. 2). The Court held a conference call with counsel for the Plaintiff and the Defendants on

---

[1] Throughout its brief in support of its Motion, Plaintiff makes repeated references to its "unfair competition" claim.  However, nowhere in the Complaint does the Plaintiff plead such a claim.

December 16, 2016, and held oral argument and an evidentiary hearing on December 21, 2016.[2]

## II.   **FINDINGS OF FACT**

Plaintiff Our Town is a sole proprietorship organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business in Newfoundland, Pennsylvania. (Doc. 1, at ¶ 1). Our Town is a bi-monthly community print publication owned and operated by Bob and Dorothy Beierle. (*Id.* at ¶ 3). Each Our Town publication "contains stories, advertising, town and community news and job postings within each geography of its local publication and the publication is distributed to the public by direct delivery and at various retail establishments." (*Id.* at ¶ 4). Defendants Michael Rousseau and Jennifer Rousseau are husband and wife and reside in Succasunna, New Jersey. (*Id.* at ¶ 2).

---

[2] Under the circumstances presented the Court will treat Plaintiff's Motion for Temporary Restraining Order as a Motion for Preliminary Injunction. *See Nat'l Ass'n of Chain Drug Stores v. Express Scripts, Inc.*, Civil Action No. 12-395, 2012 WL 1416843, at *1 (W.D. Pa. Apr. 25, 2012) ("On the following day, given the appearance of counsel on behalf of Defendants, this Court converted the amended motion for temporary restraining order into one for preliminary injunction."); *see also Roberts v. Ferman*, Civil Action No. 09-4895, 2011 WL 611827, at *2 n.1 (E.D. Pa. Feb. 18, 2011) ("Given that Plaintiff's proposed order requests a preliminary injunction, the court will treat Plaintiff's Rule 65 Petition as a request for a preliminary injunction rather than a request for a temporary restraining order."); *Bella Vista United v. City of Philadelphia*, No. Civ. A 04-1014, 2004 WL 825311, at *3 n.1 (E.D. Pa. Apr. 15, 2004) ("Given the circumstances of this case, the Court will treat the instant Motion as a request for a preliminary injunction."); *Chambers Dev. Co. v. Twp. Of North Huntingdon*, Civ. A. No. 91-1685, 1991 WL 330839, at *2 (W.D. Pa. Oct. 8, 1991) ("Chambers is seeking a TRO pursuant to Rule 65(b) of the Federal Rules of Civil Procedure. By its terms, Rule 65(b) relates to restraints sought without written or oral notice to the adverse party or that party's attorney. Here, both North Huntingdon and Hempfield had notice, were represented and participated in a hearing . . . Accordingly, this Court shall treat Chambers' Motion for Temporary Restraining Order as an application for preliminary injunction.") (internal citation and quotation marks omitted).

On February 19, 2007, Bob and Dorothy Beierle and the Defendants entered into a Franchise Agreement (the "Contract"), whereby the Defendants purchased the Our Town franchise for the exclusive territory of Morris County, New Jersey. (*Id.* at ¶ 12). The Contract provides that "[o]n execution of this Agreement by Franchisor, Franchisee shall pay to Franchisor, in consideration of the franchise granted here, a franchise fee of $3,8000.00." (Doc. 1-2, at 3). "Each calendar year the Franchisee shall pay to Franchisor on a bi-weekly basis the cost of set up and printing of the bi-weekly publication as set forth on a schedule of costs attached hereto." (*Id.*). The Contract provides that it "shall commence on the date of execution . . . and shall expire five years from the date the franchise operation opens for business, unless sooner terminated under the terms hereof." (*Id.*).

The Contract also contains a non-competition clause. Specifically, the Contract provides that:

> Upon the sale, expiration, transfer or assignment of the franchise by the Franchisee or upon the termination of this Agreement for whatever reason, Franchisee shall refrain from engaging directly or indirectly in any business similar to that which is created by this Agreement for a period of three years, at the franchise location and within 50 miles from any OUR TOWN company-owned or franchised operation.

(*Id.* at 12).[3] The Contract further provides that noncompliance with its terms "will cause irreparable damage to franchisor and its franchisees. Franchisee therefore agrees that if

---

[3] Prior to entering into the Contract, the Defendants had their attorney, Heather Darling, review the agreement. With respect to the non-competition clause, Attorney Darling asked Plaintiff to reform the clause, noting that "[t]his paragraph is overly restrictive and shall be stricken in its entirety or amended to read "Upon the sale or expiration, . . . period of one year, at the franchise location and within any other

Franchisee should engage in any such unauthorized or improper use, during or after the period of the franchise, Franchisor shall be entitled to both permanent and temporary injunctive relief...."[4]  (*Id.* at 8).

According to the Plaintiff, on January 18, 2012, Robert and Dorothy Beierle and Jennifer and Michael Rousseau entered into a five-year renewal agreement of the contract, providing that "[a]ll terms and conditions of the original franchise agreement signed by Michael Rousseau and Jennifer Rousseau on February 17, 2007 will remain the same." (Doc. 1-3, at 2).  Defendants emphatically testified that they never entered into such a contract and claim that the Plaintiff is perpetrating a fraud on this Court.

---

territory of an Our Town company-owned franchised operation." (Pl.'s Ex. K). Plaintiff refused to modify the non-competition clause as suggested by Attorney Darling.

[4] The Contract provides that it expired five years from the date it was entered into. The Contract further provided the Defendants with an Option to Renew. Specifically:

> The Rousseaus shall be given first right to renew at the expiration of each five year period indefinitely as long as Our Town continues to remain in existence. In the event that Our Town as a franchise ceases to exist the Rousseaus shall be permitted to continue to use the name Our Town in conjunction with their own publication. Any renewal of the franchise agreement will be under the same terms of this original agreement, or as otherwise agreed to in writing between the parties, and any increase in franchise fee shall be in an amount equal to the change in the Consumer Price Index from the time of the initiation date or most recent renewal, whichever is later, to the date upon which the contract is to expire. Also, in the event that Our Town ceases to exist under that name but another similar entity is formed by Franchisors or the purchasers of the franchise, such publication shall not compete with the Rousseaus in any areas they purchase under this agreement or future agreements with Our Town.

(Doc. 1-2, at 3).

On February 10, 2014, after the Defendants had sent to the Plaintiff a number of checks

that had bounced, Plaintiff and the Defendants entered into an agreement providing, in

relevant part:

> This is an official notice from the franchisor to franchisee, Michael and Jennifer
> Rousseau . . . that due to the continuation of bounced checks and the non-payment of
> West Morris Our Town Issue #167 until two weeks after the delivery date you are
> officially being notified that you are in default of your franchise agreement. . . . Due to
> the fact that we continue to receive checks that do not clear your bank due to non-
> sufficient funds for payment from you on a regular basis, personal/business checks will
> no longer be accepted as the main payment for the West Morris and East Morris Our
> Towns. From this date forward, February 10, 2014, proof of a certified check for half of
> the amount from the West Morris Our Town is required before printing of the West
> Morris Our Town edition is to begin.    The second half of payment with a
> personal/business check will still be accepted upon delivery of the West Morris Our
> Town as a show of good faith on our part.

(Pl.'s Ex. G). Defendants do not dispute that they entered into this agreement with the

Beierles. Moreover, Mr. Rousseau testified that, from the date of the Contract's expiration

in 2012 until November 2016, he abided by all of the terms of the Contract and continued to

operate an Our Town franchise.

On November 7, 2016, the Defendants contacted Our Town and informed it that they

were terminating their Contract with Our Town. (Doc. 1, at ¶ 27). Specifically, Heather

Darling, the attorney for the Defendants, sent a letter dated November 4, 2016 to Bob

Beierle. The letter stated that:

> As you are aware, I represent Mike Rousseau with regard to his affiliation with Our Town
> magazine. *This letter is to notify you that Mike Rousseau has decided to rightfully
> terminate his franchise relationship with Our Town magazine effective immediately.*

The political editorials have made it impossible for him to continue doing business in Morris County. The magazine has been losing its advertisers and distributors due to the political agenda of the publication. Additionally, many more advertisers have threatened to discontinue their advertising with Mr. Rousseau for the same reason. Mr. Rousseau's office is consistently receiving emails and telephone calls disparaging the staff personally as being racist and homophobic and for disseminating hate filled political rhetoric. Mr. Rousseau's advertisers are receiving the same disparaging calls and emails. These businesses are tired of defending themselves for advertising in the publication and fear the negative effects continued advertising in a political magazine will have on their establishments.

For the same reasons set forth hereinabove, Mr. Rousseau does not believe that Our Town is a viable brand in this area any longer. Mr. Rousseau is no longer able to secure the advertising revenue to continue to pay the print bills and be self sustaining under the Our Town name and image. As such, Mr. Rousseau has elected to direct his efforts in an alternate direction with a family friendly publication and stay away from the controversy of the political arena.

*Mr. Rousseau is terminating his affiliation in good faith.* Mr. Rousseau has always acted in a professional and responsible manner in dealing with you and will continue to do so. Mr. Rousseau expects the same consideration in return. Please refrain from contacting Mr. Rousseau's advertisers and dragging them through any more than what they have already endured in the form of verbal assaults stemming from their relationship with Our Town magazine.

Mr. Rousseau wishes you well in your future endeavors and has advised that, should you have any further questions with regard to this matter, you may contact me directly.

(Pl.'s Ex. I) (emphasis added).

That same day, Our Town learned that the Defendants were operating a similar

publication named Home Town in the same geographic territory defined in the Contract and

using the same advertisers and distributors. (*Id.* at ¶ 28). The Defendants have since

changed the name of their magazine from Home Town to New Jersey Home and Life

Magazine.

## III.   **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions and

temporary restraining orders.  "A plaintiff seeking a preliminary injunction must establish that

he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest."[5]  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20,

129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (citations omitted).  "A party's failure to establish any

element in its favor renders a preliminary injunction inappropriate."  *Ace Am. Ins. Co. v.

Wachovia Ins. Agency, Inc.*, 306 F. App'x 727, 730-31 (3d Cir. 2009) (citing *Nutrasweet Co.

v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)).  "A preliminary injunction is an

extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at 24 (citations omitted).

## IV.   **ANALYSIS**

In the Complaint, Our Town asks the Court to:  (1) enjoin Defendants "from operating

Home Town within (50) miles of the Morris County, New Jersey franchise territory set forth

in the Contract, including the Non-Compete Agreement," (Doc. 1, at 16); (2) enjoin

Defendants "from misappropriating or disclosing to any person or entity Our Town's

confidential and proprietary business information under the common law and Our Town's

Contract and Non-Compete Agreement," (*Id.*); and (3) order "Defendants to immediately

return any and all of Our Town's confidential information or materials that has come to be in

---

[5] "The standard for a preliminary injunction is the same as that for a temporary restraining order."
*Ride the Ducks, LLC v. Duck Boat Tours, Inc.*, No. Civ. A. 04-CV-5595, 2005 WL 670302, at *4 (E.D. Pa.
Mar. 21, 2005).

Defendants' possession or control as a result of operating Our Town and Home Town."
(*Id.*).

## A. Likelihood of Success on the Merits

To establish a likelihood of success on the merits, "the moving party must produce
sufficient evidence to satisfy the essential elements of the underlying cause of action."
*Hotel Investors, LLC v. Modular Steel Sys., Inc.*, Civil Action No. 4:16-1337, 2016 WL
3569247, at *2 (M.D. Pa. July 1, 2016) (slip copy) (citations omitted). Moreover, "'[i]t is not
necessary that the moving party's right to a final decision after trial be wholly without doubt;
rather, the burden is on the party seeking relief to make a prima facie case showing a
reasonable probability that it will prevail on the merits.'" *Am. Freedom Defense Initiative v.
Southeastern Pennsylvania Transp. Auth.*, 92 F. Supp. 3d 314, 322 (E.D. Pa. 2015)
(quoting *Oburn v. Shapp*, 521 F.3d 142, 148 (3d Cir. 1975)).

According to Our Town, it is likely to succeed on the merits of its claims "because
Defendants knowingly and voluntarily entered a valid, enforceable Non-Compete
Agreement prohibiting them from engaging directly or indirectly in any business similar to
the Our Town publication for a period of three (3) years at the franchise location and within
fifty (50) miles from any Our Town company-owned franchise operation." (Doc. 3, at 11).
Our Town further alleges that it is likely to succeed on the merits of its breach of contract
claim because the non-compete provision is valid, reasonable, and enforceable under

Pennsylvania law. [6]   According to Defendants, Plaintiff is unlikely to succeed on its breach of contract claim because the Contract expired in 2012 and the renewal agreement presented to the Court by the Plaintiff is a fraudulent document "which they presented to the Court in order to knowingly perpetrate a fraud on the tribunal." (Doc. 9, at 2). The Court finds that Our Town is likely to succeed on its breach of contract claim because the parties entered into a valid and binding contract and that Defendants have breached the restrictive covenant.

"To allege breach of contract in Pennsylvania, a plaintiff must show '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.'" *Kaymark v. Bank of Am. N.A.*, 783 F.3d 168, 182 (3d Cir. 2015) (quoting *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. 2004)). Although it is undisputed that the parties entered into the Contract in February 2007, and that the Contract was set to expire in five years, the parties dispute whether the Contract was renewed in 2012. The Court finds that regardless of whether the parties extended the Contract by entering into a renewal in 2012, the evidence before the Court plainly demonstrates the intentions of the parties to extend the Contract beyond its 2012 expiration. First, it is undisputed that the parties continued to abide by the terms of the Contract and that the Defendants continued to operate an Our Town franchise from 2012 until November 2016 and made repeated monthly payments to the Plaintiff. Second, the Court finds that

---

[6] Our Town also asserts that it is likely to succeed on the merits of its tortious interference and misappropriation claims. (*Id.*).

the Defendants manifested their intention to be bound by the Contract by signing a letter in 2014 with the Plaintiff where the Defendants were identified as franchisees. Third, in November 2016 counsel for the Defendants sent a letter to the Plaintiff terminating the "franchise relationship with Our Town magazine effective immediately." (Pl.'s Ex. I). On balance, the evidence before the Court overwhelmingly demonstrates that, regardless of whether the parties renewed the Contract in 2012, the parties, by their conduct, manifested an intention to be bound by the Contract. "When parties continue to conduct business following the expiration of their written agreement . . . the law may recognize their relationship as an implied in fact contract." *Morgan Truck Body, LLC v. Integrated Logistics Solutions, LLC*, Civil Action No. 07-1225, 2008 WL 746827, at *4 (E.D. Pa. Mar. 20, 2008) (citing *Luden's Inc. v. Local Union No. 6 of Bakery, Confectionary & Tobacco Workers' Int'l Union of Am.*, 28 F.3d 347, 355 (3d Cir. 1994)). "The contours of such a contract are defined by the conduct of the parties and, at least in some cases, by any terms of the expired contract that one would not reasonably expect the parties to have abandoned." *Hudson v. Radnor Valley Country Club*, No. Civ. A 95-4777, 1996 WL 172054, at *2 (E.D. Pa. Apr. 11, 1996); *see also Domico v. Downey*, Civil Action No. 06-2474, 2007 WL 2108243, at *3 (E.D. Pa. July 19, 2007) ("The terms of such an agreement are defined by the conduct of the parties, their course of dealing, and, in some circumstances, by terms that one would not reasonably expect the parties to abandon."). Thus, the Court finds that the Plaintiff is likely to succeed on the merits of its breach of contract claim because the

parties conduct following the purported expiration of the Contract evidenced an intention to

be bound by the terms of the Contract, including the non-compete provision.

The Court will next address whether the non-competition clause in the Contract is

enforceable. "Under Pennsylvania law, a covenant not to compete in a franchise agreement

will be equitable enforced when the restrictions are reasonably necessary for the protection

of the franchisor and reasonably limited as to duration of time and geographical extent."

*Soft Pretzel Franchise Sys., Inc. v. Taralli, Inc.*, Civil Action No. 13-3790, 2013 WL 5525015,

at *8 (E.D. Pa. Oct. 4, 2013).

> The seminal Pennsylvania case outlining the law of restrictive covenants as applied to
> franchising arrangements is *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 351 A.2d 207
> (1976). In *Piercing Pagoda*, the Pennsylvania Supreme Court indicated that non-
> competition clauses in franchise agreements would be upheld providing:
> 1) that the clause relates to a contract for the sale of goodwill or other proprietary
>    business interests;
> 2) that the clause is supported by sufficient consideration; and
> 3) that the restriction is reasonably limited in time and geography.

*Novus Franchising, Inc. v. Taylor*, 795 F. Supp. 122, 127 (M.D. Pa. 1992). It is Defendants'

burden to demonstrate that the non-compete covenant contained in the Contract is

unreasonable. *Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 476 (E.D. Pa. 2007);

*see also AAMCO Transmissions, Inc. v. Romano*, 42 F. Supp. 3d 700, 711 (E.D. Pa. 2014)

("Unreasonableness of the geographic scope of a non-compete is an affirmative defense on

which the [defendants] bear the burden of proof.").

Applying the *Piercing Pagoda* factors, the Court concludes that the non-competition

clause contained in the Contract appears to be valid, enforceable, and reasonable in both

time and geography. First, the covenant is ancillary to the sale of a legitimate business

interest—an Our Town franchise and associated goodwill. *See Piercing Pagoda*, 351 A.2d

at 212 (holding that an existing franchise is a legitimate business interest that can be

protected by a covenant not to compete). Second, the sale was supported by adequate

consideration furnished by the Plaintiff—namely, the goodwill and literary content of the

magazine in exchange for the $3800 franchise fee Defendants paid to the Plaintiff. Third,

the Court finds that the restrictive covenant to be reasonable both in terms of time and

geography. Courts in Pennsylvania have found that a temporal restriction of three years to

be reasonable. *See, e.g., Piercing Pagoda*, 465 Pa. at 500 (affirming injunctive relief to

enforce three-year restrictive covenant contained in franchise agreement); *DeMuth v.* Miller,

439 Pa. Super. 437 (1996) (five-year non-competition covenant enforceable). Courts have

further found that the geographic restriction imposed by the covenant—fifty miles—to be

reasonable. *See Quaker Chem. Corp.*, 509 F. Supp. 2d at 476 ("Courts have upheld non-

compete covenants lacking geographic limits (or with very broad geographic restrictions)

where the employee's duties and the employer's customers were geographically broad.");

*Novus Franchising*, 795 F. Supp. at 128-29 ("As with the time limitation, restrictive

covenants limited to a franchisee's former territories have been held to be reasonable.");

*Geisinger Clinic v. Di Cuccio*, 414 Pa. Super. 85 (1992) (restrictive covenant covering two-

year and 50 mile radius upheld as reasonable); *Am. Mutual Liab. Ins. Co. v. Kosan*, 635 F.

Supp. 341 (W.D. Pa. 1986) (fifty mile radius upheld as reasonable), *aff'd* 817 F.2d 751 (3d Cir. 1987).

In sum, the Court finds that Our Town is likely to succeed in showing that the Defendants breached the Franchise Agreement by engaging in conduct that the Contract plainly prohibits—specifically, operating a similar competing magazine within Morris County.[7]

## B. Irreparable Harm

In order for preliminary injunctive relief to be appropriate, the moving party must show that it will be irreparably harmed in the absence of injunctive relief. "In general, to show

---

[7] Upon consideration of the parties' arguments and the evidence presented at the December 21, 2016 oral argument and evidentiary hearing the Court further finds that Our Town is *not* likely to succeed on the merits of its tortious interference with contractual and/or prospective business relations claim and its claim for "misappropriation of confidential information, trade secrets, and vendor relationships/inventible disclosure." (Doc. 1, at 14). "Under Pennsylvania law, to prevail on a claim for tortious interference with existing or prospective contractual relationships, a party must prove: (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference." *Acumed LLC v. Advanced Surgical Servs,. Inc.*, 561 F.3d 199, 212 (3d Cir. 2009). Plaintiff has failed to identify any third party with whom it had a contractual or prospective contractual relationship with, or any purposeful action by the Defendants intended to harm that unidentified relationship.

With respect to Plaintiff's misappropriation claim, to succeed on a claim for misappropriation of a trade secret under Pennsylvania law the Plaintiff must plead and prove "(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff." *Moore v. Kulicke & Soffa Indus. Inc.*, 318 F.3d 561, 566 (3d Cir. 2003). The Court concludes that the Plaintiff has failed to demonstrate the existence of any proprietary, trade secret, or confidential information that the Defendants have misappropriated. Although counsel for the Plaintiff attempted to argue that its "customer list" constituted a trade secret, he backed off that claim after the Court pointed out that any individual reading an Our Town publication would be able to readily identify Our Town's customers—i.e., those businesses which had advertised in the publication.

irreparable harm a plaintiff must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)). "[A] showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a clear showing of *immediate* irreparable harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (emphasis in original) (internal citation and quotation marks omitted). Moreover, the Third Circuit has stated that:

> This Court has held that more than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' *Ammond v. McGahn*, 532 F.2d 325, 329 (3d Cir. 1976), or a 'presently existing actual threat; (an injunction) may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law.' *Holiday Inns of Am., Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969). In a similar case involving noncompetition and non-disclosure agreements, it was declared to be well-settled law that 'injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will an injunction be issued 'to restrain one from doing what he is not attempting and does not intend to do.' *Standard Brands Inc. v. Zumpe*, 264 F. Supp. 254, 267-68 (E.D. La. 1967) (footnotes omitted).

*Continental Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980).

Here, Our Town claims that "having to compete against the significant investment that [it] made in the Defendants as a franchisee and that it contracted to protect in a restrictive covenant constitutes irreparable harm." (Doc. 3, at 15). The Court agrees and finds that Our Town will suffer irreparable injury in the absence of preliminary injunctive relief. As an initial matter, the Court notes that "[a] franchisor has a protectable interest in the sale of a

franchise because of expenditures made by a franchisor for market development and

training, the grant of an exclusive sales area, and permission to use the franchisor's name."

*Rita's Water Ice Franchise Corp. v. DBI Inv. Corp.*, No. 96-306, 1996 WL 165518, at *4

(E.D. Pa. Apr. 8, 1996). Moreover, Courts have found that a violation of the restrictive

covenant contained in the Franchise Agreement constitutes irreparable injury where, as

here, the violation of the covenant affects the Plaintiff's legitimate business interests. *See,*

*e.g., Arch Personal Care Prods., L.P. v. Malmstrom*, 90 F. App'x 17 (3d Cir. 2003) (affirming

preliminary injunction enforcing a non-compete clause); *Soft Pretzel Franchise Sys.*, 2013

WL 5525015, at *10 ("Irreparable injury results when a former franchisee competes against

a franchisor in breach of a restrictive covenant contained in the parties' franchise

agreement.") (internal citation and quotation marks omitted); *AAMCO Transmissions, Inc. v.*

*Singh*, Civil Action No. 12-2209, 2012 WL 4510928, at *4 (E.D. Pa. Oct. 1, 2012) (same);

*InterMetro Indus. Corp. v. Kent*, No. 3:CV-07-0075, 2007 WL 518345, at *5 (M.D. Pa. Feb.

12, 2007) ("Applying Pennsylvania law, InterMetro has shown a reasonable probability of

success in enforcing Mr. Kent's covenant not to compete. InterMetro has also established

that it is threatened with irreparable harm if Mr. Kent is not enjoined from working at its

competitor's business, as Mr. Kent's knowledge of InterMetro's business could harm its

competitiveness."); *Prison Health Servs., Inc. v.* Umar, No. Civ. A. 02-2642, 2002 WL

32254510, at *20 (E.D. Pa. July 2, 2002) ("Under Pennsylvania law, a breach of a covenant

not to the compete resulting in loss of goodwill and interference with customer relations can

result in irreparable harm and thus be the basis for injunctive relief."); *Hillard v. Medtronic, Inc.*, 910 F. Supp. 173, 179 (M.D. Pa. 1995) ("To the extent that the restrictive covenant is being violated, Medtronic is suffering irreparable harm by the potential loss of customers posed by Conklin's activities.").

Accordingly, the Court is satisfied that in the absence of injunctive relief Plaintiff will suffer irreparable harm.

## C. Harm to the Non-Moving Party

"If the potential harm to the nonmovant outweighs the potential benefits bestowed upon the movant, injunctive relief should generally be denied." *Stilp v. Contino*, 629 F. Supp. 2d 449, 467 (M.D. Pa. 2009). Defendants maintain that they would be unable to make a living if the Court were to enforce the non-competition clause which weighs in favor of denying Plaintiff relief. However, where, as here, the harm Defendants complain of is entirely of their own making Courts recognize that "[t]he self-inflicted nature of any harm suffered by the wrongdoer . . . weighs heavily in favor of granting preliminary injunctive relief." *Napolitano*, 85 F. Supp. 2d at 498 (citing *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir. 1998)). Thus, the Court finds that the balance of equities weighs in favor of granting the injunction and that any harm the Defendants may suffer as a result of enforcing the non-competition clause is entirely of their own making and significantly outweighed by the harm to the Plaintiff. *See Tantopia Franchising Co., LLC v. West Coast Tans of PA, LLC*, 918 F. Supp. 2d 407, 420 (E.D. Pa. 2013) ("In balancing the hardships to

the parties, any injury defendants might suffer as a result of the issuance of the preliminary injunction is significantly outweighed by the irreparable harm plaintiff would continue to suffer as a result of defendants' violation of the Non-Compete Covenant.").

## D. The Public Interest

Finally, the Court must consider the public interest. "As a practical matter, if a plaintiff demonstrates both likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). Here, Plaintiff has demonstrated both a likelihood of success on the merits and irreparable injury and therefore it necessarily follows that the public interest will favor the Plaintiff. Moreover, Courts recognize that "there is a strong public interest in upholding the non-compete agreement to the extent reasonably necessary to safeguard Plaintiff's legitimate proprietary interests." *Bioquell, Inc. v. Feinstein*, Civil Action No. 10-2205, 2011 WL 673746, at *9 (E.D. Pa. Feb. 16, 2011). Thus, the Court finds that the public interest weighs in favor of granting injunctive relief.

## E. Security Bond

Rule 65(c) of the Federal Rules of Civil procedure provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Although the amount of the bond

is left to the discretion of the court, the posting requirement is much less discretionary. While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory." *Frank's GMC Truck Ctr. Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988). "Such an extremely narrow exception exists where complying with the preliminary injunction raises no risk of monetary loss to the defendant." *Zambelli Fireworks Mfg. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (internal citation and quotation marks omitted). Moreover, the Third Circuit has "never excused a District Court from requiring a bond where an injunction prevents commercial, money-making activities." *Id.*

Here, neither party has addressed the security bond requirement contained in Federal Rule of Civil Procedure 65(c). The Court will exercise its discretion and require Plaintiff Our Town to post a $7,600 bond prior to the injunction taking effect.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion will be granted in part and denied in part. A separate order follows.

Robert D. Mariani
United States District Judge